IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RAMON R. INNISS,       )
                       )
     Plaintiff,        )
                       )
v.                     )   CIV. A. NO. 19-0295-KD-MU
                       )
SGT. FINKLEA, *et al.,* )
                       )
     Defendants.       )

## REPORT AND RECOMMENDATION

This action, which has been referred to the undersigned for appropriate action

pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R), is before the

Court on Defendants' motion for summary judgment.[1] (Doc. 53). As set forth below, the

undersigned **RECOMMENDS** that Defendants' motion for summary judgment be

**GRANTED, in part,** and **DENIED, in part.**

## I. Procedural Background

Plaintiff Ramon R. Inniss, an Alabama prison inmate proceeding *pro se* and *in*

*forma pauperis*, filed a complaint under 42 U.S.C. § 1983 on June 17, 2019. (Doc. 1).

Inniss filed a motion to amend his complaint to allege additional damages on December

11, 2019. (Doc. 8). The Court granted the motion to amend on January 28, 2020, and

ordered that Defendants be served. (Doc. 14). Defendants filed their Answer and

Special Report (Docs. 45 and 46) on July 24, 2020.

---

[1] The Court converted the Defendants' Answer and Special Report to a motion for
summary judgment. (Docs. 45, 46, 53).

Prior to the filing of the Answer and Special Report, on April 27, 2020, Inniss filed a "motion to hold action in abeyance" until he could further recover from the effects of a cerebrovascular accident suffered in October of 2019 or he could find another inmate to assist him in reading and responding to this action. (Doc. 28). At that time, the Court ordered medical records and a doctor's medical opinion regarding Plaintiff's original limitations from the stroke, improvements since the stroke, his current medical status, and prognosis for improvement. (Doc. 47). Upon review of the records produced by Defendants on November 25, 2020 (Doc. 50), the Court determined "Plaintiff is both physically and mentally capable of prosecuting his § 1983 action against these Defendants." (Doc. 51 at p. 1). The records confirmed, based on a neurology consultation conducted in June of 2020, that Inniss has some right-sided weakness with weakness in the lower extremity greater than in the upper extremity; loss of a portion of his field of vision on the right side, but not blurry vision; and no mental status change, like memory or concentration problems. (Doc. 50-1 at pp. 2-3). The medical opinion was that Plaintiff's current medical status was good and that he should be able to read and/or write. (Doc. 50-1 at pp. 4-5). It was also determined that Plaintiff had access to a law library and his personal legal materials and documents. (*Id*. at p. 5; *see also* Doc. 52). Plaintiff's motion was thus denied on January 15, 2021 (Doc. 51), and the Answer and Special Report were subsequently converted to a motion for summary judgment.

After Defendants' answer and special report was converted by the Court into a motion for summary judgment, Inniss timely filed a document entitled "Certificate Motion of Interested ADOC Parties," in which he reiterated his version of the facts set forth in

his complaint, but alleged that the brain damage, vision loss, speech problems, and memory loss he suffered made him unable to properly litigate this motion. (Doc. 54). Thus, Inniss requested that Defendants' motion for summary judgment be continued or that he be granted an attorney to assist him in defending the motion. (*Id*. at p. 3). Because this Court had already considered and denied such a request, Inniss's request for a continuance of Defendants' motion for summary judgment was denied, and he was ordered to file any additional response to the motion for summary judgement on or before September 2, 2021. (Doc. 57). Inniss did not file any additional response to the motion for summary judgment.

## II. <u>Factual Allegations</u>[2]

In his complaint, Plaintiff Inniss alleges that, while he was housed in cellblock D at Holman Correctional Facility, officers used excessive force against him in violation of the Eighth Amendment.[3] (Doc. 1). According to Inniss, on December 6, 2018, he was told by Sgt. Finklea to let Finklea strip search him, and he complied. (Doc. 1 at p. 4). Finklea then told him to take his wheelchair[4] and roll himself to the front of the dorm with the other inmates so he could search his property. (*Id*. at p. 4). When Finklea called him back to his bed area, Inniss wheeled himself there and, when he got there, Finklea asked him, "why [he] didn't give it up." (*Id*. at p. 5). According to Inniss, about that time,

---

[2] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riveria Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[3] Inniss signed his complaint under penalty of perjury and swore that the facts set out in the complaint are true and correct. (Doc. 1 at p. 14).

[4] Innis states that he was given a wheelchair due to injuries he suffered in a car accident prior to his imprisonment. (Doc. 1 at p. 6).

"all of the CERT team officers surrounded [him]." (*Id*.). When he told Finklea that he didn't have anything, Finklea slapped him in the face and Officer McQuirter hit him across the top of his head with a Billy club, busting his head and causing him to fall out of his wheelchair on to the floor face down. (*Id*.). Inniss claims the other CERT team officers then hit him with their Billy clubs all over his body, from the back of his head all the way down his back and legs. (*Id*.). Inniss alleges the officers "kicked and stomped" on him, "so viciously," until he was knocked unconscious and defecated on himself. (*Id*.). When Inniss came to, Sgt. Finklea and Officer Patterson mocked him for defecating on himself, and Officer Stafford and an unidentified officer lifted him from the floor and slammed him back into his wheelchair, where he was handcuffed. (*Id*. at pp. 5-6). Inniss alleges that Stafford then punched him in the back of the head behind his left ear and called him a "big stupid ass nigger." (*Id*. at 6).

Inniss opines that the incident occurred because McQuirter and Bullard, two of the CERT team officers, work at Holman and harass him all the time. (*Id*.). Inniss alleges that he never received a disciplinary charge in relation to the incident. (*Id*.). Inniss asserts that the CERT team did not come to Holman on the date of this incident to restore order, but to shake down the whole dorm. (*Id*.). He alleges that Wardens Stewart, Raybon, and Mitchell gave the CERT team permission to "shake the whole cell down," "to beat any prisoner up that they found contraband on," and "to use their Billy clubs and pepper spray."[5] (*Id*. at 7). Inniss further alleges that Lt. McKenzie, Captain

_____

[5]  Inniss maintains that, while he was waiting in the front of Dormitory D for the bunk areas to be searched, the CERT team found contraband in Inmate Wendell Malone's personal area and called him to his bed. (Doc. 1 at p. 4). Inniss alleges when Inmate

Smith, and Captain Bolar failed to intervene in the attack, alleging "they authorized and condoned" his being beaten by the CERT team. (*Id*.).

Inniss further claims that Warden Stewart authorized the institutional review board to increase his custody but that the hearing lacked due process because there was no one from the central review board at the custody review hearing and he was denied witnesses. (*Id*. at p. 7).

Inniss has asserted claims against Sergeant Finklea, Officer McQuirter, Officer Stanford, Officer Patterson, Sergeant Wilson, Officer Bullard, Captain Smith, Captain Bolar, Lieutenant McKenzie, Warden Stewart, Warden Raybon, and Warden Mitchell in their individual capacities for compensatory and punitive damages for the alleged harm suffered in relation to the force used against him. Specifically, he alleges that Finklea, McQuirter, Stanford, Patterson, Wilson, and Bullard violated his Eighth Amendment right to be free of cruel and unusual punishment by using excessive force against him (*Id*. at pp. 8-9, 12-13) and that Smith, Bolar, and McKenzie violated his Eighth Amendment rights when they failed to intervene and protect him from excessive force at the hands of the other officers (*Id*. at p. 11). He further alleges that Wardens Stewart, Raybon, and Mitchell violated his Eighth Amendment rights when they authorized the use of excessive force. (*Id*. at pp. 9-10). He further asserts a Fourteenth Amendment Due Process claim against Stewart, Raybon, and Mitchell based upon his allegation that improper procedures were used when the institutional review board increased his

_____

Malone reached his bed, the CERT team officers "all beat inmate Malone up in unison." (*Id*. at p. 5).

custody. (*Id*.). Inniss requests compensatory damages in the amount of $25,000 from each defendant and $250,000 in punitive damages from each defendant. (*Id*. at p. 14). In his amended complaint, Inniss alleges that in September 2019, he suffered a stroke, which "he feels . . . was caused [] as an after effect to the beating he was given by the C.E.R.T. team" on December 6, 2018. (Doc. 8 at pp. 1-2). He claims the stroke "left him feeling paralyzed, numb, and dazed." (*Id*. at p. 1). Inniss seeks $100,000 from "each Defendant that subjected him to cruel and unusual punishment last year for the pain and suffering endured" following his stroke. (*Id*. at p. 2).

In his response to the motion for summary judgment, Inniss repeats his claims that he was beaten and stomped by Defendants in violation of his Eight Amendment rights and asserts that he now suffers chronic pains in his stomach and groin. (Doc. 54).

### III. <u>Defendants' Answer and Special Report</u>

In their Answer and Special Report, Defendants have denied the allegations made against them by Inniss and asserted available immunity defenses. (Doc. 45). They have filed personal affidavits, an incident report, and medical records in support of their position. (Docs. 46; 46-1 through 46-14).

Defendants admit that, on December 6, 2018, the Southern and South Central CERT teams conducted routine facility searches of Holman. (Doc. 46 at p. 6; Doc. 46-1 at pp. 1-2). According to Sgt. Finklea's Declaration, at approximately 10:20 a.m., while conducting a search of Inniss's personal and living area in Dormitory D, he observed Inniss concealing an unknown substance in his left hand, Inniss failed to comply with Sgt. Finklea's instruction to turn over the substance in his hand, and instead, Inniss

6

swung a closed fist, striking Sgt. Finklea in the facial area. (Doc. 46-2 at pp. 1-2). Sgt. Finklea alleges that he countered with two palm heel strikes to Inniss's upper chest area. (*Id*. at p. 2). He further alleges that Inniss grasped him around the waist and attempted to throw him to the ground, but Sgt. Finklea escaped his grasp and used a two on one takedown of Inniss. (*Id*.). In so doing, according to Finklea, Inniss's head and body struck the bed railing as he was being taken to the ground by officers, who then secured Inniss with handcuffs. (*Id*). Sgt. Finklea then recovered a plastic baggie containing 120 strips of a white substance believed to be "Flakka," 29 individually wrapped packages of a white crystal-like substance believed to be crystal meth, and 2 small packages of a white powder-like substance believed to be cocaine from Inniss. (Doc. 46 at p. 7).

Lt. McKenzie was present in D-Dorm at the time of the incident. He maintains that he observed Inniss attempt to cause harm to Sgt. Finklea and affirms that, once Inniss was subdued, he did not witness any further force applied to Inniss. (Doc. 46 at p. 7; Doc. 46-3). Sgt. Stanford admits that he entered D-Dorm at the relevant date, but states that he has no knowledge of using force against Inniss. (Doc. 46-4). Sgt. Jesse Wilson avers, "I was not present during the alleged incident." (Doc. 46-5). Sgt. Jermaine Bullard avers, "I was not in the area where inmate Innis alleged the incident took place, I was in a different area searching a different inmate. At no time did I inflict cruel and unusual punishment nor did I use any excessive force or any force on inmate Innis. Inmate Innis had to have mistaken me with another member from a different CERT Team." (Doc. 46-6). Officer McQuirter avers, "During the time of the alleged incident I

was searching a different inmate. Inmate Innis had to have mistaken me with another member from a different CERT Team. At no time did I inflict cruel and unusual punishment and I did not use any excessive force or any force on inmate Innis." (Doc. 46-7). Officer Patterson avers, "I [] entered Holman Correctional Facility dormitory B with the [CERT team]. I did not use any type of force on inmate Ramon R. Inniss, #304894 on the said date and time and have no knowledge of this incident." (Doc. 46-9).

Captain Vencini Smith avers, "I do not have any knowledge whether direct or indirect of inmate Innis being beaten by any security personnel, nor have I or would I give authorization to go ahead and kick anyone's behind. These allegations are false." (Doc. 46-8). Warden Cynthia Stewart avers she was not present at Holman when the CERT team entered the facility on December 6, 2018, and further stated that, "[w]hen the team enters the facility, they are under the supervision of the State CERT Commander and/or Team Commander to accomplish the goals with absolute minimum force, while seeking the positive resolution of the events." (Doc. 46-10 at p. 1). She further avers, "[a]t no time will or have I observed, allowed or permitted any abuse, assault or excessive force to any person.  As Warden of W.C. Holman Correctional Facility, if any staff violates any portion of A/R #208 and corrective action is warranted, there is no hesitation on my behalf to follow and carry out the procedures and protocols established by the [ADOC]. Inmate Innis have[sic] never heard me granting authorization to use excessive force and his statement of such is false." (*Id.* at pp. 1-2). Warden Terry Raybon avers, ". . . at no time during my career have I instructed the

members of the CERT Team to assault an inmate. Inmate Innis' allegation that I

commanded these officers to assault him and other inmates is false. When Inmate Innis'

reclassification hearing was held, it was held in accordance to the Classification manual,

and ADOC regulations." (Doc. 46-11). Warden Phillip Mitchell avers, "at no time during

my career have I instructed any member of the CERT Team to assault an inmate.

Inmate Innis' allegations that I gave orders to the CERT Team to assault him and other

inmates are false. When Inmate Innis' reclassification hearing was held, it was held in

accordance to the Classification manual, and ADOC regulations." (Doc. 46-12). Captain

Regina Bolar avers, "[a]t no time did I have the authority to dispatch the CERT team to

enter a dorm and/or search an inmate's property. I am not authorized to tell the CERT

team to use excessive force and/or instruct them as to the preparation of a body chart.

At no time did I witness excessive force being used against Inniss of December 6, 2018.

Inmate Inniss' allegations against me are false. I have not violated Inmate Inniss'

constitutional rights." (Doc. 46-13).

Officers Patterson and Dennis escorted Inniss to the health care unit following

the incident, where he received a medical assessment. (Doc. 46-14 at p. 1). The Inmate

Body Chart Documentation Form states that Inniss told the nurse that he "got hit." (*Id*.).

The examination revealed an 8.5 cm laceration on his right upper side, abrasions to

both knees, and a 2x2 cm contusion to the top of his head. (*Id*.). Inniss was transported

to the emergency room of the local hospital. (*See id*. at pp. 2-5). The ED Provider Notes

reflected that Inniss was brought to the ER by guards "complaining of being beaten up."

(*Id*. at p.2). The Notes further state: "Reportedly patient tried to assault a correctional

officer. He was violently restrained and in the process of being restrained he had multiple injuries. He is complaining of being hit on the head as well as being hit in the tarsal region and 'all over my body.'" (*Id*.). Examination revealed a 4-5 cm superficial laceration on the top of his head and an area about 5 cm in diameter that was swollen and bruised in the left posterior auricular region (behind the ear). (*Id*. at p. 3). He was tender throughout the neck and from the torso region all the way to both lower extremities. (*Id*.). He received stitches for the laceration to his scalp and returned to Holman. (*Id*. at p. 4).

## IV. <u>Standard of Review</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." ***On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.***

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted) (emphasis added).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.'" *Id*. (citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence to defeat a motion for summary judgment. *Id*. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*,

550 U.S. 372, 380 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

## V. <u>Legal Conclusions and Analysis</u>

Inniss proceeds pursuant to 42 U.S.C. § 1983. "In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." *Martinez v. Burns*, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). There is no dispute that the named Defendants, as employees of the Alabama Department of Corrections, are state actors for purposes of this action. Thus, to establish his asserted claims, Plaintiff must establish that each named defendant, personally, acted to deprive him of a constitutional right.

### A.  Eighth Amendment Claims of Excessive Force and Failure to Protect

#### 1. Defendants Finklea, McQuirter, Stanford, Patterson, Wilson, and Bullard

The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). To establish an Eighth Amendment excessive force claim against Defendants, Inniss must prove both an objective and subjective component. He must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that Defendants

"act[ed] with a sufficiently culpable state of mind; i.e., that they acted maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citations omitted); *see also Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1196 (11th Cir. 2003) (to satisfy the objective component, the plaintiff must show the complained of conduct "shocks the conscience"). Both inquiries are contextual, and "the objective harm inquiry is responsive to contemporary standards." *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38.

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L.Ed.2d 156). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7-8, 112 S. Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S. Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skirtch v. Thornton*, 280 F.3d 1295, 1300-01 (11th Cir. 2002). Accordingly, in determining whether force used was excessive, relevant factors include the "need for

the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). Notably, prison officials "acting to preserve discipline and security" are given "broad deference" when evaluating whether force used was excessive or not. *Pearson v. Taylor*, 665 F. App'x 858, 863-64 (11th Cir. 2016).

Here, there is no dispute that force was used against Innis. Contested, however, is the constitutionality of the force used, as well as the question of which officers used force against Innis. As the record currently stands, the parties' versions of the facts are contested, and neither version is blatantly contradicted by the record. The law is clear that, at the summary judgment stage, it is not the function of the reviewing court to weigh the evidence and determine the truth of the matter; rather, it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252.

> To avoid summary judgment of his claims against each individual officer, Plaintiff must show more than "mere presence at the scene." *Binay*, 601 F.3d at 650 (6th Cir. 2010). Instead, he must show "that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Id.* (quotation marks omitted). Under the third prong, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

*Slayton v. City of River Rouge*, 515 F. Supp. 3d 695, 704 (E.D. Mich. 2021), *reconsideration denied*, No. 17-13875, 2021 WL 859028 (E.D. Mich. Mar. 8, 2021).

In this case, Innis has submitted, under penalty of perjury, his testimony that, when he denied having contraband, Finklea slapped him in the face and McQuirter hit him across the head with his Billy club, which busted his head and caused him to fall out of his wheelchair. He has further asserted that these defendants, along with Stanford, Patterson, Wilson, and Bullard, then hit, kicked, and stomped him and that, after Stanford lifted him from the floor, put him back in his wheelchair, and he was handcuffed, Stanford punched him in the back of the head behind his left ear. Medical records support injuries to Innis that coincide with these allegations. (Doc. 46-14). These defendants have denied these allegations. Finklea asserts that Innis was hiding contraband and when asked to show what was in his hand, Innis hit Finklea and grabbed him around the waist. Finklea states that he used a two on one takedown to subdue and handcuff Innis and that action caused him to hit his head and body on the bed rail. McQuirter, Stanford, Patterson, Wilson, and Bullard deny participating in the use of force against Inniss and deny having any knowledge of the use of force against Inniss. They have each submitted their own declarations setting forth the foregoing, but no other evidence in support of their version of events.

To the extent Innis's version of the incident conflicts with the sworn declarations put forth by Defendants Finklea, McQuirter, Stanford, Patterson, Wilson, and Bullard, the Court must accept Innis's version of the facts as true at the summary judgment stage. *Kingsland v. City of Miami*, 382 F.3d 1220, 1227 (11th Cir. 2004), c*ert. denied, De Armas v. Kingsland*, 543 U.S. 919 ("The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment stage,

we must accept [Plaintiff's] version of the facts as true.") (citing *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)); *see also Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1139-40 (11th Cir. 2007) (citing *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied."). In this case, the parties' versions of the incident in question are in direct opposition to one another; the resolve of which turns on an issue of credibility, which may not be determined through a motion for summary judgment.

These defendants have each asserted the defense of qualified immunity. "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The defendant has the initial burden of proving that he acted within the scope of his discretionary authority.  *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994). To determine whether a defendant acted within the scope of his discretionary authority, the court must consider whether the actions of which the plaintiff complains "(1) 'were

undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Id.* at 1566 (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). Thus, the term "discretionary authority" in this context includes actions that not only entail an element of discretion but also those actions that are more ministerial in nature. *See id.* Accordingly, discretionary authority will generally be found if the defendant is working within the confines of his or her job. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). Based on Plaintiff's allegations and the record, these defendants were acting within their discretionary authority at the time of the subject incident.

Because these Defendants have met the burden of proving that they acted within the scope of their discretionary authority, Plaintiff now has the burden of proving that the actions of these Defendants violated clearly established constitutional rights of which a reasonable person would have known. *See Harlow*, 457 U.S. at 818; *Lassiter*, 28 F.3d at 1150 n.3. As explained by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), the "threshold question" to determine whether Defendants are entitled to qualified immunity is as follows: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201; *see also Siegert v. Gilley*, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all"). Second, the court must decide "whether the right was clearly established." *Id*. The

17

determination of these elements may be conducted in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Eleventh Circuit has made clear that the defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted). Thus, these Defendants are not entitled to a finding of qualified immunity at the summary judgment stage.

Consequently, because the facts submitted by the parties are in conflict and, if Inniss's version of the events is believed; i.e., that he was assaulted by these Defendants for no reason and severely enough to require treatment by an outside hospital and continued physical issues, he could establish that excessive force was used, it is recommended that summary judgment be **denied** as to **Defendants Finklea, McQuirter, Stanford, Patterson, Wilson, and Bullard** as to Inniss's claims that they individually violated his Eighth Amendment rights by using excessive force against him.

## 2. Defendants Smith, Bolar, and McKenzie

Inniss alleges that Captain Smith, Captain Bolar, and Lieutenant McKenzie failed to intervene in and failed to protect him from the alleged assault by the above correctional officers. He specifically asserts that the incident "transpired as if they authorized and condoned that I be beaten up by the entire CERT team." (Doc. 1 at p. 7). He declared that Smith gave "tacit authorization for them to go ahead and kick our behinds." (*Id.* at p. 11). He also specifically alleged that McKenzie breached a "duty to

order them to stop beating me up" and that he "just stood by and watched, basically supervising the riot team as they beat me…."  (*Id.* at p. 12). Captain Smith avers, "I do not have any knowledge whether direct or indirect of inmate Innis being beaten by any security personnel, nor have I or would I give authorization to go ahead and kick anyone's behind. These allegations are false." (Doc. 46-8). Lt. McKenzie was present in D-Dorm at the time of the incident. (Doc. 46-3). He maintains that he observed Inniss attempt to cause harm to Sgt. Finklea and affirms that, once Inniss was subdued, he did not witness any further force applied to Inniss. (*Id.*). Captain Regina Bolar avers, "[a]t no time did I have the authority to dispatch the CERT team to enter a dorm and/or search an inmate's property. I am not authorized to tell the CERT team to use excessive force and/or instruct them as to the preparation of a body chart. At no time did I witness excessive force being used against Inniss of December 6, 2018. Inmate Inniss' allegations against me are false. I have not violated Inmate Inniss' constitutional rights." (Doc. 46-13).

A prison official violates the Eighth Amendment when he or she acts with deliberate indifference to a substantial risk of serious harm to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Unless a supervisory official personally participates in the alleged unconstitutional actions, a supervisor can only be individually liable for an Eighth Amendment violation if the plaintiff shows a causal connection between the supervisor's actions and the alleged constitutional deprivation. *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on

> notice of the need to correct the alleged deprivation, and he
> fails to do so; 2) a supervisor's custom or policy results in
> deliberate indifference to constitutional rights; or 3) facts
> support an inference that the supervisor directed the
> subordinates to act unlawfully or knew that the subordinates
> would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby,* 450 F.3d 1231, 1237 (11th Cir. 2006). The third manner in which a

causal connection may be established is the only one possibly supported by Inniss's

complaint. Innis alleges that these defendants authorized the CERT team to assault

him. To prevail on this claim, Inniss must show that a ***supervisor*** directed the

defendants who allegedly assaulted Innis to do so or knew that they would do so and

failed to stop them. In this case, Inniss does not allege that Smith, Bolar, or McKenzie

were supervisors of the CERT team that was involved in this incident. In fact, Warden

Stewart stated that, "[w]hen the team enters the facility, they are under the supervision

of the State CERT Commander and/or Team Commander to accomplish the goals with

absolute minimum force, while seeking the positive resolution of the events." (Doc. 46-

10 at p. 1). The evidence thus supports a finding that Smith, Bolar, and McKenzie were

not supervisors over the CERT team members. Moreover, Innis alleges that the incident

"transpired ***as if*** they authorized and condoned that I be beaten up by the entire CERT

team," and he declared that Smith gave "***tacit*** authorization for them to go ahead and

kick our behinds." (Doc. 1 at pp. 7, 11) (emphasis added). It is well-established that

"[u]nreliable conjecture . . . presented as a 'belief' without any basis in ascertainable

fact, [is] not the type of admissible evidence required to survive a motion for summary

judgment," *Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1318 (11th

Cir. 2011). Thus, the Court finds that these claims against Smith, Bolar, and McKenzie are based on speculation and cannot withstand a motion for summary judgment.

As noted above, a supervisor can be liable if he personally participates in the alleged unconstitutional actions. "An officer who is present at the scene [of an altercation] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). But an officer can only be liable for failing to protect the inmate if the officer was in a position to intervene yet failed to do so. *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 924 (11th Cir. 2000). Inniss does not allege that Bolar was present or in a position to intervene during the subject incident, and while he does allege that Smith was in D dorm, he does not allege that Smith witnessed his alleged assault or was in a position to intervene. They have both stated that they did not witness force being used against Innis. Therefore, Inniss has not presented substantial evidence in favor of this claim against Bolar or Smith. However, Inniss specifically alleges that McKenzie breached a "duty to order them to stop beating me up" and that he "just stood by and watched, basically supervising the riot team as they beat me…." (Doc. 1 at p. 12). Lt. McKenzie, who was admittedly present in D-Dorm, maintains that he observed Inniss attempt to cause harm to Sgt. Finklea and affirms that, once Inniss was subdued, he did not witness any further force applied to Inniss. (Doc. 46-3). Accordingly, because Inniss's and McKenzie's' versions of the incident in question are in opposition to one another, the resolution of which turns on an

issue of credibility, Inniss's failure to protect claim against McKenzie cannot be determined through a motion for summary judgment.

Based on the foregoing, the undersigned recommends that summary judgment be **granted** in favor of **Smith and Bolar** and **denied** as to **McKenzie** on Innis's claims for failure to protect and failure to intervene against them.

### 3. Defendants Stewart, Raybon, and Mitchell

Inniss has also brought Eighth Amendment claims against Wardens Stewart, Raybon, and Mitchell based upon his allegations that they gave the CERT team permission to beat up any prisoner who had contraband and to use their Billy clubs and spray. (Doc. 1 at pp. 9-11). Inniss did not allege that he heard any of these Defendants give such orders or make such statements. Rather, he simply makes the blanket statement based presumably on speculation. Warden Stewart avers that she was not present at Holman when the CERT team entered the facility on December 6, 2018, and further stated that, "[w]hen the team enters the facility, they are under the supervision of the State CERT Commander and/or Team Commander to accomplish the goals with absolute minimum force, while seeking the positive resolution of the events." (Doc. 46-10 at p. 1). She further avers, "[a]t no time will or have I observed, allowed or permitted any abuse, assault or excessive force to any person…. Inmate Innis have[sic] never heard me granting authorization to use excessive force and his statement of such is false." (*Id.* at pp. 1-2). Warden Terry Raybon avers, ". . . at no time during my career have I instructed the members of the CERT Team to assault an inmate. Inmate Innis' allegation that I commanded these officers to assault him and other inmates is false."

(Doc. 46-11). Warden Phillip Mitchell avers, "at no time during my career have I instructed any member of the CERT Team to assault an inmate. Inmate Innis' allegations that I gave orders to the CERT Team to assault him and other inmates are false." (Doc. 46-12). In his response, Inniss does not dispute these statements. Inniss's speculative allegations are not sufficient to defeat the properly supported motion for summary judgment filed by Wardens Stewart, Raybon, and Mitchell on the Eighth Amendment claims Inniss has asserted against them. Accordingly, the undersigned recommends that summary judgment be **granted** in favor of **Stewart, Raybon, and Mitchell** on the Eighth Amendment claims asserted against them.

B. <u>Fourteenth Amendment Due Process Claim</u>

Innis has also asserted a Fourteenth Amendment Due Process claim against Wardens Stewart, Raybon, and Mitchell based upon his allegation that improper procedures were used when the institutional review board increased his custody to close custody. Specifically, Inniss states that his rights were violated because the institutional review board hearing lacked due process because there was no one from the central review board at the custody review hearing and because he was denied witnesses at the hearing. (*Id*. at p. 7). Inniss has not alleged that the decision to reclassify him was arbitrary or capricious.

"The law is settled that an inmate in the Alabama prison system has no constitutionally protected interest in the procedure affecting his classification because the resulting restraint, without more, does not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Clark v.*

*Jones*, Case No. 2:18-CV-160-ECM-KFP, 2021 WL 925879, at *9 (M.D. Ala. Feb. 17, 2021) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *Williams v. Stewart*, Civil Action No. 18-00432-KD-B, 2019 WL 5849706, at *4-5 (S.D. Ala. Oct. 11, 2019). An Alabama inmate "has no constitutionally protected liberty interest in being classified at a certain security level or housed in a certain prison." *Kramer v. Donald*, 286 F. App'x 674, 676 (11th Cir. 2008); *see also Moody v. Daggett,* 429 U.S. 78, 88 n.9 (1976) (noting that Congress has given prison officials discretion to control prisoner classification); *Meacham v. Fano,* 427 U.S. 215, 223-24 (1976) (no liberty interest protected by the Due Process Clause is implicated in a prison's reclassification and transfer decisions), *cited in Mendoza v. Fla. Dep't of Corr,* Case No. 4:21-CV-00363-MW-MAF, 2021 WL 6137493, at *4 (N.D. Fla. Dec. 13, 2021). Thus, neither the decision to reclassify Innis or the method used to do so violated his constitutional rights because he had no constitutional right to a specific classification or constitutional protection from being reclassified. As discussed by this Court in *Williams v. Stewart*, "[i]n the absence of a liberty interest, [Inniss] was not entitled to due process." 2019 WL 5849706, at 5. Thus, his claim based on alleged procedural violations fails. "Not every violation of a state agency of its own rules rises to the level of a due process infringement." *Smith v. Georgia,* 684 F.2d 729, 732 n.6 (11th Cir. 1982). Accordingly, because Inniss has failed to state a claim for a violation of his due process rights, Wardens Stewart, Rabon, and Mitchell are entitled to summary judgment in their favor on Innis's due process claim.

## VI. CONCLUSION

Based on the foregoing, the undersigned recommends the following:

1) It is recommended that summary judgment be **DENIED** as to **Defendants Finklea, McQuirter, Stanford, Patterson, Wilson, and Bullard** as to Inniss's claims that they individually violated his Eighth Amendment rights by using excessive force against him;

2) It is recommended that summary judgment be **GRANTED** in favor of **Defendants Smith and Bolar** and **DENIED** as to **Defendant McKenzie** on Innis's claims for failure to protect and failure to intervene; and

3) It is recommended that summary judgment be **GRANTED** in favor of **Defendants Stewart, Raybon, and Mitchell** on both the Eighth Amendment and Fourteenth Amendment claims asserted against them.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72(b); S.D. Aʟᴀ. L.R. 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if

necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

      **DONE** this **18th** day of **January, 2022**.

                        s/P. BRADLEY MURRAY
                        UNITED STATES MAGISTRATE JUDGE